Parker, J,
The plaintiff in error was tried in the court of common' pleas of this county under an indictment charging him with the crime of murder in the second degree. A verdict of “guilty as charged” was returned by the jury, A motion for a new trial was made and overruled, and judgment was entered upon the verdict. The errors relied upon chiefly, are:
1. The action of the court in overruling the motion for a new trial. Among the grounds of the motion for a new trial was this: That newly discovered evidence had come to the knowledge of the plaintiff in error, material to the issue, which was brought to the attention of the court by affidavits.
2. Errors in the charge of the court, and
3. That the verdict was not supported by the evidence, and that it was against the weight of the evidence,
The indictment charges that Ira Bailus “did unlawfully, purposely and maliciously kill Daniel Peters”, in Lucas county, Ohio, on the 12th day of February, 1898.
From the evidence it appears that the place of the homicide was a house of prostitution, kept by one Jennie Bennett, at 518 Lafayette street, in the city of Toledo; that there were present at the time of the occurrence, in addition to the plaintiff in error and the deceased, Mrs. Jennie Bennett, the proprietress of the place, who is the aunt of the plaintiff in error; Mrs. Bailus, the mother of the plaintiff in error and the sister of Mrs. Bennett; Nellie *228 Knocker — which is perhaps not the true name of that person — who seems to have been an inmate of the house of prostitution kept by Mrs. Bailus, at thea corner of Superior and Washington streets; Frank Hodges, Samuel Myers, a French musician — and from the record it is uncertain whether this is another person than Frank Hodges, or whether it is the same person; Maude Hall, Rose Fowler, Maggie Hock, and Jessie Brooks, the females named being inmates of the place kept by Jennie Bennett.
From the undisputed evidence in the case it appears that deceased came to the place of Jennie Bennett i» company with Nellie Knocker, between one and two o’clock P. M. of the 12th day of February. That Mis. Bailus came in some time later; that Ira Bailus, the defendant, came in still later- — -perhaps as late as four o’clock in the afternoon; that Ira Bailus, in the course of an altercation between Maude Hall and his mother, and an affray in which he had taken some part, nr had undertaken to take some part— and in which the deceased interfered with him — slew the deceased by stabbing him with a jack-knife. The deceased retired from the affray to the'rear part of the building in which this occurred, and died within a few minutes after receiving the wound.
That the evidence of the witnesses to which I refer may be understood, I will undertake to describe, briefly, the lower floor of the building in which the homicide occurred. The entrance to the building at the front brings one into a hall at the right' side. In this hall is a stairway which leads to the second floor of the building. At the left of the entrance is a door leading to a front room, which was occupied as a bar, containing a counter, ice-box and bar- fixtures — a place where intoxicating liquors and other articles which are used in a place of that kind were furnished to customers. Proceeding through the hall-way we arrive at a door leading into a room in the rear of the hall *229 and the bar-room, called the first parlor, the dimensions of the room being about 12x12 feet. There is also a door leading from the bar-room into this first parlor, the door being near the door which leads from the hall-way into the first parlor. At the left as you pass into the first parlor is a small room, which you enter by a door from the first parlor. Immediately in the rear of the first parlor is a room designated as the second parlor, the dimensions of which are 14x12 feet; and this is entered by a door from the first parlor; and immediatley in the rear of the second parlor is the kitchen, containing the usual kitchen furniture, and this is entered by a door from the second parlor;, and leading out of the kitchen is a door to the rear of the building and to a coal shed, and from that you enter into an area or yard in the rear of the building. In the first parlor was a stove and other furniture, and in the second parlor a lounge, a piano, a stove and other furniture.
It appears that an altercation arose between Mrs. Bailus and Maude Hall in consequence of Maude having won away from Nellie Knocker, her companion, the deceased, Mr. Peters, and that' this altercation led to a fight between Mrs. Bailus and Maude Hall; that they came together in a fight on three distinct occasions in the course of the afternoon, and on the last occasion Ira Bailus — 'who at the time appears to have been in one of the rear rooms — was attracted to this fight by the cries of his mother, and upon going to the door leading from the first to the second parlor, he observed Maude Hall knock his mother down. Thereupon he at first undertook to pick up a poker lying near the stove, evidently with' the intention of using that as a weapon upon some one, but, updn being requested to deliver it up to one of the girls present, he did so, but afterwards interfered, without producing any weapon, and either struck or pushed Maude Hall so that she went over into the corner of the room — it does not appear that she fell down. *230 About this time the deceased — who was sitting m a rocking-chair in the first parlor, where this occurred — rose from his chair and approached Ira Bailus' — advanced towards him, and struck him. The evidence is very clear that he struck him at least once,and there is considerable evidence tending to show that he struck him twice. Maude Hall — who is the chief witness on behalf of the'State — says that Peters struck at Bailus, but she does not say that he struck him. It appears, however, from her testimony that he was stabbed after striking at Bailus, whether he struck him or not —that Peters did not desist from his attack upon Bailus, and that he was then in .a position and attitude, and his manner was such as to convince Maude Hall that he would have struck,or struck at Bailus again, had not Bailus resisted the attack. It appears that-upon arising from his chair and advancing upon Bailus, Peters said something to the effect that two upon one was not fair, evidently having reference to the purpose or attempt of Ira Bailus to interfere in the fight which was going on between his mother and Maude Hall. Immediately upon Peters’ striking Bailus it appears that he received the wound from which he died, and that upon receiving it he retired immediately from the attack, and from the room to the rear of the building, and there expired. The whole difficulty between Bailus and Peters, according to the testimony, must have occupied but a very few moments. After Bailus had delivered this mortal wound it appears that he went to the hall of the building —passing through the bar-room to reach it — and there undertook to interfere again with the fight which was still progressing between his mother and Maude Hall. He does not at that time seem to have been aware of .the fact that he had delivered a mortal blow; but, soon after reaching this part of the building a cry was set up that the wounded man was dying; and there is testimony tending to show that thereupon Ira Bailus ran to a drug store near by and *231 telephoned to'a physician to come and take care of the wounded man. "Later in the day, according to his own testimony, he was informed that the wounded mán had died, Then he appears to have secreted himself; but in the evening of the nest day he voluntarily surrendered himself to the custody of the officers of the law.
As to the affray, I read from the testimony of Maude Hall, on pages 5 and 6 of the record. After telling about the difficulty between herself and Mrs. Bailus — about the interference upon the part of Jennie Bennett, about the threats of Mrs. Bailus, etc., she was asked to go on and state what occurred from that time when Mrs. Bennett separated the witness and Mrs. Bailus, and she says:
“Well, then I stepped behind Mrs. Bennett, then to the hall door, and when I stepped back there Dan got up,he kind o’leaned on his •chair like this (indicating); he was so drunk that he could hardly get up, he says ‘No, two onto one is not fair’. At this Mrs. Bailus had grabbed me on the hair again, and Ira says ‘If any son of a bitch wants any of this’, he says, ‘they can have it’, or ‘I will run it into them’, or something' — I don’t know as lean say.it just as he did, but something "like that.’’
This is the only witness who testifies that the deceased was in this drunken condition. It is apparent that the deceased at that time had been drinking somewhat, but apparently, not sufficient to cause such a state of drunkenness as this witness describes — but the other witnesses declare that he was not so drunk. Then this witness is asked what Bailus did when he said that, and she answerer
“That is the first I noticed he was standing with the. knife in his hand. At that Dan Peters took two or three steps towards him, and struck him, he kind o’ struck with one hand, like this (indicating), and the other this way (indicating); as he did he kind o’ reeled against the stove sidewise. At that Ira struck him, struck him twice j he struck him with the knife in his hand.”
And it appears that there were two wounds upon the *232 breast of the deceased: one upon the right breast, which penetrated until the knife struck a rib, and the other in the left breast, which penetrated the heart and caused the death. The testimony then proceeds:
“Q. Did you notice where he struck him ? A. I think he struck him once like this (indicating), but I can’t say —I know he struck him up here some place (indicating). Then Mrs. Bailus still had her hands on my hair yet, so I says ‘Don’t, Mrs. Bailus, look what an awful fight Ira is in.' She never paid no attention, she just stood there, she had her hands just this way holding me on the hair. I had hold of her wrist that way (indicating). I says ‘Don’t do that, look what an awful fight Ira is in’. She never paid any attention to him — at that Dan Peters — I see him, be didn’t do nothing, I didn’t hear him say anything. He opened his vest. As he did that he walked out of the door, and Ira made the remark that he would finish me now with the knife. He comes around- in the hall and grabs me in the hair, and Frank Hodges loosened his hold on my hair, and Sam Myers put me into a little sitting room and held the door. * * * ”
That is as much as I care to read from that part of the testimony of this witness. Now as to this alleged declaration upon the part of Ira Bailus: “If any son of a bitch wants any of this they can have it”. Or “I will run it into them”, this is the only witness who testifies to it. It appears that there were at least half a dozen ether persons present, with equal opportunity of observing what was going on, or at least of hearing what was said, and all testify that they heard nothing of this kind said; but several of them testify that they heard Ira say to Peters, as he approached' him and struck him, “Keep away from me! Keep away from me” ! Neither did any other witness, so far as the testimony indicates, hear Ira threaten this witness that he would finish her with the knife. Neither was there anything in the testimony tending to show that Ira made any attempt with his knife to “finish” *233 this witness,or to do her any injury, That this witness was under the impression, from what she observed, that Peters intended' to pursue the attack which he had made upon Bailus, is apparent from her answer appearing at page 23. She is asked as to her testimony upon another occasion about this affray, and this question was put to her:
”Q. You deny that you made any statement that he struck more than once, do you?”
And she answers:
‘‘A. I said that he struck once; I suppose he would have struck again — once is all he struck.
And,.upon the same page:
‘‘Q. Did Peters try to strike Ira before he drew his knife? A. No: Ira had the knife in his hand; he . said if any son of a bitch wanted anything they could get it; he would stick the knife into them. Then is when Dan — I don’t know — he took, I guess, two or three steps towards Ira and struck at him,’1
It appears from that that Peters had been forewarned by Bailus; that Bailus had this weapon in his hand, and would use it upon any person who attacked him, or who undertook to interfere with him upon that occasion. There is nothing in the words or acts of Bailus as related by this witness, indicating that Bailus intended to begin an affray by making assault upon anybody with a knife.
. As to the cause of the killing, this witness testifies to the attentions which had been paid her by Peters, and the request of Peters that they might retire where they might be by themselves, and to the fact that they did retire into a side room off from the first parlor,and that Nellie Knocker came there and pushed the. door open. Being interrupted there, they’went up-stairs, where they remained some considerable time. She testifies that as they went upstairs, Mrs. Bailus caught Peters by, the coat, pulled him back and said to him something to-try to dissuade him from go *234 ing up stairs with her, but he went nevertheless. They remained up there perhaps half an hour when Rose Fowler came up and advised the witness that she had better remain up-stairs, that Mrs. Bailus was down-stairs,very angry, and drunk, and looking for a fight. Afterwards she came downstairs with Dan Peters, and soon after the affray between witness and Mrs. Bailus commenced,
That the purpose of Ira Ba’ilus was to interfere on behalf of his mother, who appeared to be getting the worst of the fight, is clear from the testimony of all the witnesses.
This witness testifies,at page 41,that Ira said to her “You don’t need to think I am going to let you hurt my mother —to lick my mother — “I can’t say exactly.” It appears that this witness was a younger woman than Mrs. Bailus— stouter and more active. Mrs. Bailus was advanced in years, and apparently somewhat feeble at that time,in consequence of recent illness,, and besides was somewhat disabled, ap-. parentlv, by being under the influence of liquor.
The witness Frank Hodges testifies that he is a piano player, (and from that I judge that he is the piano player referred to in'the testimony of the other witnesses); that he saw Peters advance towards Ira Bailus and strike him;that the blew staggered Bailus back, and that Bailus uttered the words: “Keep away from me! Keep away from me!” At that time it appears that this witness repaired to the back part of the premises with the poker, which had been taken from Bailus, and'deposited it in a closet, and continued on his way out — evidently not diposed to be present,or take any further part in the altercation.
Samuel Myers is a brother of Mrs. Bailus, and of Jennie Bennett. He was present. He testifies that Peters struck Ira twice with his clenched fist; that he struck him upon the chest the first . time, but where the second blow took effect he could not say. That -upon his rising and advancing upon- Bailus he said “Two on one is not fair”; *235 that when he advanced upon Bailus and struck him, Bailus said “Keep way from me”. Thereupon this witness, according to his testimony, walked into the hall in order to ’"separate the women, who were fighting, and saw nothing more of the. difficulty between Bailus and Peters; he saw no knife, and did not hear the words spoken by Bailus, testified to by Maude Hall.
Jennie Bennett testified that she saw Peters ' strike Ira with his fist in the chest; didn’t hear the declarations testified to by Maude Hall; saw no knife, and saw nothing more of the affray. It appears that she was standing in the hall door, facing towards the front of the building, and undertaking to separate the women who were fighting; had her back towards these men who were engaged in this affray, and saw but little of it.
Mary Bailus, the mother of the plaintiff in error, tells of the difficulty with Maude Hall, and, of course, lays all the blame on Maude, as Maude in her story had laid the blame upon Mrs. Bailus. She says that during the last conflict between herself and Maude Hail, Ira came forward and interfered saying, “I can’t stand this any longer! That is my mother!” But she was in the hall so far that either because of her position or because of her engagements, she did not observe the affray between Bailus and Peters.
These, I should say, are all of the witnesses except Ira Bailus, who testified to the affray, and I have given briefly the substance cf the testimony of each.
James McDermont and Edward Keyes testify that on an occasion shortly prior to the 12th of February, 1898, they had a conversation with Ira Bailus, and advised him, or informed him, that Dan Peters was a good man in a fight, evidently meaning that he was a good fighter; that he was a regular bull-dog in a fight, that it would not be well for any man who should take hold of him.
*236 Then comes the plaintiff in error, as a witness, and testifies as to the whole transaction. It appears from his testimony that he is eighteen years of age; that during the summer season he is engaged upon a farm belonging to his parents, in the vicinity of the city; that he had seen Peters but once before the occasion on the 12th of February, and that was upon an occasion when Peters had had a difficulty with one of the other witnesses, which led to the inquiry by Bailus as to the kind of a man Peters was, when he said he received the information testified to by McDermont and Keyes as having been given to him by them. It does not appear from the testimony of any of the witnesses that Peters and Bailus had ever had any conversation at any time prior to the 12th day of February; that they had ever had the slightest difficulty, or that there was any feeling between them, or any cause for any feeling, or that there was any intention upon the part of either to make an assault upon the other, prior to the very moment when they came into contact with one another in the parlor. Bailus states that upon the evening of this day he returned to his home, and finding his mother absent, and desiring to have her at home with him when he ate his supper, and being notified that she had gone to his aunt’s, he went to that place. That he found his mother, and asked her if- she would come home, and she answered that she would be ready in a few minutes. That thereupon he retired to the rear part of the building, and engaged in a game of cards with Myers. After playing for some time he came forward to the second parlor, and was in the second parlor when he was attracted by the cries of his mother, and went to the door between the first and second parlors,and saw Maude Hall knock his mother down, and then he undertook to interfere, as he says, to save his mother from being hurt. He says:
“I was listening to the music there; I looked around *237 and this Hall woman she had gone out of the room. When, the music quit playing I heard my mother holler, When I run into the door I saw this Maude Hall strike her and knock her down. I ran right over and tried to separate them. I got them separated, and I had just got them nicely separated when they got to fighting again, They got around into the hall. My aunt Jen was standing right in the door. I tried to get in twice, when Mr. Peters — I didn’t know where he was — he came right up. He drawed kind of back, and he says ‘Two on one ain’t fair’ — I guess he meant that I was going to hit this Maude Hall- — -and he struck me and staggered me back. I told him to keep away from me. He kept coming right onto me. ”
“Q. Did he strike you again? A. He struck me once and drawed back again. At that I pulled out my jackknife, and I says ‘Keep away from me’. He kept coming right at me until he got me clear into the corn'er, and then I guess is when I struck at him, As soon as I struck at him I went through the bar-room into the hall and comes around. They were fighting again. We got them separated — my uncle was in there — we separated them. That was in the hall in the front part of the house. Some one comes in there and says ‘That man is dying’, At that I thought — I didn’t know what to think. I started out of the front door and went to Gates’ drug store, corner of Erie and Lafayette, and I phoned for the doctor, and had tl em phone for the doctor. When I came back to the house I went up-stairs. My mother was upstairs in bed * * *”
This relates to when he returned to his own home. Later on in the day, he says he was’informed that the man was dead. He is.asked if he made this declaration: “If anybody wants any of this I will give it to them”, and the other declarations testified to by Maude Hall, and he denies having said anything of that kind. He says that when Peters struck him he knocked him,Bailus, back a couple of feet; that he,Bailus,-then said “Now keep away from me.” And he adds “At that I pulled my jack-knife, I was afraid *238 of the man,” Further on in his testimony he is asked:
“Q. Did you know where you struck him (Peters)? A. I don’t know. I didn’t know I did strike him.”
‘‘Q. Did you have any intention, now, to? A. No, sir.
“Q, What were you intending to do there? A. I didn’t know what I done — he come at me — I was so excited and afraid.I didn’t know what I was doing.”
‘‘Q. You didn’t intend to kill him? A. No, sir, not a bit; no, sir. ”
The witness then produced, at the request of counsel, a knife, which he says he used, and he testifies that he had had it for about eight months. It appears that that morning, or perhaps the day before, he had ground that knife, out in the country — sharpened it; but there is no evidence tending to show that the knife was carried, or sharpened, or prepared with any purpose on the part of Ira Bailus to use it upon the person of the deceased, or,indeed, any other person. On cross-examination he testifies further upon the subject of the affray, and he is asked:
‘‘Q. When he struck you, what did you do? A. He staggered me back, and I says ‘Keep away from me’. Peters came after me, and I pulled out my jack-knife. Peters came on.- I says ‘Now keep away from me’. I was about six or seven feet from the wall. He didn’t stop, I says ‘Keep away from me.’ I throwes up my hand one side. Peters didn’t do it. When he got me clear back into the corner then I struck Mr. Peters.
‘‘Q. You say you staggered back when he first struck you? A. Yes, sir; when be struck me right this side here.
‘‘Q. When you first related that in answer to a question of your attorney, didn’t you say ‘I stopped, when he struck me, I stepped back’, and then you- said you staggered back? A. I said I staggered back.’’
Further on, he says he held the knife in his right hand.
‘‘Q. What did you do — shove it up, like that (indicating)? A. No sir; When he got me clear in the corner, I shoved it out like that, and accidentally the knife struck him.
*239 “Q. Just accidentally happened to strike him? A. I think it was, yes, sir; I had no intention of cutting him.
“Q. You don’t think that he ran against your knife, do you? A. He ran right onto me, of course I probably — ■ he was very near — -I told him to keep away from me.
“Q. Do you think he ran onto it twice? A. I thought —I don’t think he ran onto it twice, no, sir; I think when I told him to keep away from me he must have got cut the second time — I said ‘Keep away from me.’
“Q. As a matter of fact yo.u struck him twice? A. No, sir.”
It appears, as I have .said, that the deceased was wounded in two places. As to the comparative size of these men, there does not appear to have been a great deal of difference beween them, though Peters appears to have been a somewhat heavier man than Bailus. The testimony shows that Bailus’ weight was about 140 pounds; that his height was five feet nine and a half inches; while Peters’ weight, according to the testimony of some of the witnesses, was about 160, and according to others, about 180 pounds, and this height was five feet eight inches, As I have said, the plaintiff in error was eighteen years of age. The deceased was twpnty-six years old. It will be observed that the only witness testifying to any circumstances or any declarations which could tend to show that Ira Bailus intended to stab, and perhaps mortally wound Peters — or anybody else who should come upon him — is the witness Maude Hall. We do not hesitate to say that the oral testimony, standing alone, is not sufficient to justify the verdict. We do not believe that the jury would have brought in this verdict upon the unsupported testimony of Maude Hall. If they had,, we would have felt bound to say that it was against the weight of the evidence.. The experience of courts warns them to scan with caution and view with suspicion the testimony of abandoned women. As a class, their testimony is peculiarly and especially unreliable, and where it *240 is apparent that a witness of this character may have a motive for mis-stating or coloring the facts, her unsupported statements should not ordinarily be given much weight. For my own part, I would be loth to rely upon the unsupported statements of such a witness, where the consequences are as grave as those flowing from the verdict in this case. While such a witness may tell the exact truth, yet experience teaches that where there is the slightest motive for testifying falsely the probabilities are strongly against her telling the exact truth. The witness Maude Hall is not only a lewd and dissolute woman, but it is clear that there was much in the circumstances of this homicide that would tend to arouse her animosity against the prisoner and his mother, and provoke her to seek satisfaction in revenge upon both through the instrumentality of this prosecution. We must bear in mind that persons of her low life and character are moved by causes that would not affect people of good morals and tender sensibilities. The conduct of people of this class is often incomprehensible when tested by the standard applied to the generality of mankind. Causes that we would regard as trifling and insufficient, are by the low and brutal regarded as most weighty, and their notions of just retribution are often,to the ordinary judgment, the most fantastic, distorted and extreme,
But in this case, that Maude Hall should be thus biased against the prisoner and his mother, is not strange, but quite natural. According to the statements of this witness, the mother had assaulted her repeatedly and viciously, had struck her and pulled her hair,and otherwise maltreated her, without any provocation upon, the part of the witness; and wholly without cause justifying such action, and solely because the witness, in the ordinary competition of their business, had gained a patron and customer,in the perBonofthe deceased, away from the prisoner’s mother, or the denizens *241 of her establishment. Then the prisoner had interfered in the fight between her and his mother at a time when the witness was likely to gain the battle, and had knocked the witness down, and was bent upon taking further part in the ■combat to her disadvantage; and all this, it is plain, the witness regarded as an outrageous wrong against her. Not only this, but the person slain came to his death through interfering in her behalf — 'through becoming champion of her rights. All these things combining would most naturally arouse a feeling of resentment in her against the prisoner and • his mother; and we are not surprised to find evidence of her feeling against them in her testimony; indeed we would be greatly surprised to find it otherwise. Nor are we prepared to entirely discredit the statements of witnesses contained in the affidavits,filed on the motion for anew trial,of declarations made by her, in harmony with such feelings and notions of revenge; though she denies having made these statements. In these affidavits it is testified by witnesses that this witness declared that, “When Ira ■ Bailus gets arrested she would swear against him like hell”, and “that Mary Bailus, mother of Ira Bailus, had tried to give her the worst of it, but she had got the best of her ■ this time.” And that this witness, while confined in the county jail, made this declaration to a sister of the plaintiff in error, as she was leaving the jail after visiting her brother: “God damn you, I have got even with your mother now!” —or words to that effect.
Now the jurors should have given just consideration and weight to these things which were brought before them by the testimony, tending to affect the credit of this witness, and perhaps they did. I repeat — we doubt if the jury would have brought' in this verdict upon her unsupported testimony; we do not see how they could have done so; they *242 would not have been warranted in doing so, and therefore we look further in endeavoring to discover sufficient grounds elsewhere in the record to support this verdict. And looking through the record, we find nothing else to support this verdict, or tending to show that the killing was maliciously and purposely done, except the circumstance that a knife-—a deadly weapon — -was the instrument in the hands of the prisoner which produced the death of Daniel Peters. That this circumstance,and the charge of the court upon it,had-a-controlling effect upon the result is apparent, and therefore-we direct our attention to this phase of the case.
The-circumstances of the case, and the grave consequences of the verdict, require us to scrutinize the charge of the-court, critically to make sure that the prisoner shall not be-prejudiced by any erroneous ’ utterance upon that subj'ect. Now, to make out a case of murder in the second degree, it is necessary for the State to prove that the killing was done unlawfully, purposely- — -that is intentionally — and maliciously. This is fairly and distinctly set forth in the charge of the court, and this purpose or intention must not be to do anything less than to kill. If the proof satisfies the-jury that the purpose or intention of the prisoner was to cut or wound — short of inflicting a mortal wound — no matter-how serious an injury, short of death, may have been intended, the crime of murder is not made out. This is held in Sutliff v. The State,18 Ohio,469-474,and in a number of Ohio authorities besides,and is held by this court distinctly in the case of Bennett v. State, 10 Circuit Court Reports, beginning at page 84. That was a case where death was produced by stabbing with a jack-knife, during an affray,, and in the course of the opinion, by Judge Haynes, the-law upon this subject is discussed, and other authorities besides those I have cited,rare referred to by him; and upon page 106 this is said by Judge Haynes:
“The burden of proof is upon the State to show from all. *243 the circumstances, clearly and beyond a reasonable doubt, that there was a purpose in the mind of this young man to kill — a formed purpose, as much as though he said to himself: ‘I strike you now, and I do it with the intention of killing you.’ ”
Now,the learned judge upon the trial of this case, in the court below,charged the jury upon the subject of the use of deadly weapons, as follows:
“When one person assaults another violently,with a dangerous weapon, likely to kill, and not in self-defense', or in defense of habitation, property or person, and not in a sudden heat of passion caused by provocation apparently sufficient to make the passion irresistible or involuntary, and the life of the party thus assaulted is destroyed in consequence of such assault, then the legal and natural presumption is that death or great bodily harm was intended; and in such case the law implies malice, and.such killing would be murder.” ,
We think that this language is subject to the construction that, where the circumstances of the death,produced by the use of a deadly weapon, are such as to raise a presumption that either death or great bodily harm was intended, the killing would be murder; and this because a deadly weapon was used — indeed we do not think this is fairly open to any other construction. We are of the opinion that this is erroneous. A jury might find from the circumstances in a given case, where death resulted from the use of a deadly weapon, that the intent of the person using such weapon was to wound and not to^kill. Manifestly it is error to charge that in such a case the killing would be murder. There was evidence in this case, not only in the testimony of the prisoner, to the effect that he did not intend to kill Peters, but m the circumstances of’[his having no previous acquaintance with or cause''for ill will against Peters, his omission to follow after Peters when Peters withdrew from the combat, his going to the hall to *244 renew his effort to assist his mother, and afterwards — upon the word passing that Peters was badly hurt — ’phoning for a doctor, tended, if believed (and the charge must be framed with a view[of credence being given to any testimony in the case), to show that the prisoner did not intend to kill Peters.
Now the^jury, in applying this part of the charge to the case in hand, might have concluded, indeed was bound to conclude, that the presumption of malice and intention to-kill, as a matter of law, made the offense murder though convinced, as a^matter of fad, that the intent was-to wound only, that this legal presumption arising out of the use off a deadly weapon precluded a finding, or giving effect to a finding, that the intent was to do less than to kill, in which event,though the use of the weapon was unlawful, the crime would'not be of a higher grade than manslaughter. No doubt this was an inadvertence on the part of the judge; he meaning to say, in effect, that if death resulted,an intent to produce death would be presumed, and if other injuries resulted, the intent to inflict such injuries would be presumed.
This leads us to a farther consideration of this part of the charge as to the presumption arising from the use of a deadly weapon, for we think it is incorrect in its general scope, even with the part as to great bodily harm omitted. The general rule as to the presumption arising from the use of a deadly weapon, is laid down in 1 Greenleaf on Evidence, section 18, as follows:
“Thus, also, a sane man is conclusively presumed to contemplate the natural and probable consequences of his own acts; and, therefore, the intent to murder is conclusively inferred from the deliberate use of a deadly weapon.”
But this rule, thus broadly stated without respect to the circumstances of the killing aside from the isolated fact of the use of a deadly weapon, and as to the conclusiveness of the inference, is not sustained by modern authorities. The *245 great weight of authorities is against it. We think it is not sustained by the courts of Ohio, and that in the case of Erwin v. The State, 29 Ohio St., 186, it is distinctly and materially modified.' That is a case in which death was produced by the use of a deadly weapon. A part of the charge of the court is as follows:
“If you find from the evidence tha.t the defendant used a deadly weapon in this case, and that death ensued from the use of such deadly weapon, then the law raises the presumption of malice in the defendant, and also an intent on his part to kill the decedent.”
From the syllabus, and elsewhere in the case, it appears ■ that the precise point decided by the court was that this was erroneous because applied so distinctly to the particular case before the jury, by the language quoted, but the court indicates its opinion upon the general subject very distinctly at page 191, in the following language:
“As an abstract proposition, where the circumstances of a homicide are not known, further than the mere fact that the death was caused by the use of a deadly weapon, we do not deny that the jury may., from such fact alone, infer both malice and a purpose to kill. But where the attending circumstances are shown in detail, some of which tend to disprove the presence of malice or purpose to kill, it is misleading and erroneous to charge a jury that in such case the law raises a presumption of malice and intent to kill from the isolated fact that death was caused by the use of a deadly weapon. In such case the presence of malice or intent to kill must be determined from all the circumstances proven, including, of course, the character of the weapon.”
In Commonwealth v. Hawkins, 3 Gray (Mass.), 463, Chief Justice Shaw said that the doctrine of York’s case is that, where the killing is proved to have been committed bj7 the defendant, and nothing further is shown, the presump, tion of law is that it was malicious, and an act of murder, and that it was inapplicable to a case when the circumstan. *246 ces attending the homicide were fully shown by the evidence; that,in such a .case,the homicide being conceded,and no excuse being shown, it was either murder,or manslaughter, and that the jury, upon all the circumstances, must be satisfied beyond a reasonable doubt that it was done with malice, before they could find the defendant guilty of murder, This qualification'of the rule in York’s case limits the application of the rule very much, for in very few cases will the killing by the defendant be the only thing shown. The circumstances in every case will tend to prove or to disprove malice, which then becomes a question of fact to be decided by the jury. This view of the rule is in aecoid with Hawthorn v. State, 58 Miss. 778, and other cases from Vermont, Texas, Maine, New York, Massachusetts, Kentucky, and other states cited in a note to section 18, 1 Greenleaf on Evidence. These cases we have examined, and they fully sustain what is said of them in this note.
Farris v. Commonwealth, 14 Bush (Ky.) 362, contains a full and instructive discussion of this subject by Judge Hines, in which many of these authorities are reviewed. This was a case of death produced by a deadly weapon,and it supports the doctrine that where the circumstances of the killing appear, a charge that malice or intent to kill is presumed from the use of a deadly weapon is erroneous.
This doctrine is supported by Wharton on. Evidence, indeed in all of Wharton’s works on Criminal Law, where ever the subject is discussed. Section 764 of Wharton on Evidence is especially full, and it seems to us philosophical .and correct on this subject. Other cases of special note upon the subject are: Stokes v. People, 53 N. Y. 164; Thomas v. People, 67 N. Y. 218, and the case referred to in 3 Gray, 463.
While the utterances of the Supreme Court of this state upon this subject do not warrant the adoption of -the doctrine of Stokes v. People, supra, or Farris v. Common *247 wealth, supra, yet an examination of the Ohio cases will show that they fall far short of sustaining the rule as stated in the text of Greenleaf on Evidence, and that, in giving effect to the presumptions arising from death, they do not go beyond the. doctrine of the case ofa Commonwealth v. Hawkins, 3 Gray, supra; that.is to say,that it should only be applied and given in charge to a jury in a case where the circumstances of the death are not brought before the jury, further than the fact that the death occurred from a deadly weapon, and that the author of the death is the defendant in the case. The true rule deducible from the Ohio cases is that where all the attending circumstances of a homicide, including the use of a deadly weapon, appear in evidence, the jury should not be told that a presumption of malice or intent to kill arises from the fact that a deadly weapon was used. Though where the intentional use of a deadly weapon, resulting in •death, is shown, and the circumstances of the homicide are not explained by the slayer, and do not otherwise appear in •evidence, a presumption of malice and intent to kill arises. The doctrine that from the fact of killing with a deadly weapon an intent to kill may be inferred, and that upon this inference of intentional killing the further inference of malice arises, goes a long way, it seems to us, toward overcoming, by arbitrary inferences, the presumption of innocence, and allowing the State to make out by inferences, which may or may not be correct, that which the law requires it to establish affirmatively beyond a reasonable doubt. Especially is this so when it is said of these inferences that they are legal presumptions, and not mere argumentative ■deduction from tne facts, for “facts legally presumed are, until rebutted, as effectual as facts proved.” The rule •ought not, therefore, to be extended beyond,cases of homicide where the circumstances are unknown. In the case at bar, all the circumstances of the homicide were laid before *248 the jury. In our judgment, the statement as to the presumptions arising from the use of a deadly weapon may have been misleading, and should have been omitted. It. does not appear that they were not misleading, and, applying the rules applicable to such cases — that where error appears prejudice will be presumed, we feel impelled to reverse this judgment.
It is true that care was exercised to qualify the rule as to the presumptions arising from the use of a deadly weapon by the statement, in effect, that if the weapon was used in self-defense, or in defense of habitation, property or person, or in a sudden heat of passion caused by provocation apparently sufficient to make the passion irresistible or involuntary, the presumptions of malice and intent to kill would not arise. But even if it were proper to charge at all as to these presumptions in a case of this kind, it does not appear that all possible qualifications of.the rule, or all that should have been noticed in this particular case, were mentioned to the jury. In this case there was testimony tending to show that the stroke that produced death was accidentally, unconsciously or involuntarily given, by one overcome by fright and excitement.. Therein it resembles the case of Erwin v, The State, supra. Such a state of facts: was not stated as one that would prevent the taking effect of these presumptions. True, in another part of the charge' the court says that, “if death of the decedent resulted from his accidentally running against the knife which the defendant may have had in his hand, and not from the act of the defendant in stabbing the decedent, then the defendant would not be guilty of the crime charged;” but this is said in illustration of the rule of law, being stated as to excusable' homicide committed by accident by one while in the commission of a lawful act. It does not reach the case of one who is engaged in an unlawful assault, and while so engaged unin ten tionally and accidentally kills another — a cas& *249 which there was testimony tending to make out here. As-to such case, the presumptions stated were to be given full-force by the jury under these instructions. To repeat, the vice in this charge consists in this: The fact of the killing, with a deadly weapon being undisputed, if the jury had found that deceased ran against the knife of the accused, but that the accused was at the time engaged in an unlawful combat, either with Maude Hall or with the decedent, or was otherwise unlawfully engaged or if the-jury had found that the defendant purposely stabbed the-deceased, but that his intent was to wound or disable, and not to kill, in either case, under this charge, the jury would be required to bring in a verdict of murder, though-in either esse stated the crime would be manslaughter. This; proposition as given in charge to the jury, is quite different from that frequently found in the books to the effect that, where death is produced by the use of a deadly weapon, an. inference or presumption of murder will arise, and be given effect, unless circumstances of justification, excuse or extenuation appear, and that, unless these circumstances otherwise appear, it will devolve upon the slayer to produce evidence thereof.
The proposition charged is, that a certain fact appearing —that is, death resulting from the use of a deadly weapon, the legal presumption is that the killing was done purposely and maliciously, “and such killing would be murder/’ Here there is no suggestion that this is a rebuttable presumption. On the contrary, the jury are 'distinctly told that unless it shall appear that the killing was done in self-defense, or in hot blood produced by passion, or (perhaps), by accident happening in a certain way, while the slayer is doing a lawful act, the law requires a verdict of murder.
If every possible state of facts deducible from the evidence which would overcome this presumption, were stated as exceptions, or if the jury were told in general terms that. *250 this would be the presumption in the absence of facts and circumstances showing justification, excuse or extenuation, perhaps there would be no error; but we believe it to be the safer and better practice, in a case like this, where the circumstances of the killing are all shown, to omit this proposition as to the presumptions arising from death produced by the use of a deadly weapon,or to call attention to the use of such weapon as a circumstance to be given such weight as the jury may in its judgment, and in connection with all the other facts and circumstances in evidence, deem it worthy of. Too much prominence, and a controlling effect may be easily given to the isolated circumstance of the use of a deadly weapon. As a matter of fact, in many cases, it is ■entitled to but little weight. In the case at bar,the instrument used was an ordinary jack-knife, such as in common parlance would not-be described as a deadly weapon, or a weapon at all. Primarily,it is not a weapon, though its use may warrant its being so designated. There is nothing in the case indicating that the prisoner ever contemplated its use as a weapon, prior to the moment he used it on this occasion. Manifestly,such a state of facts would not ordinarily be regarded, by the average juror, in the same light and ■as of the same significance as a case where the instrument used is a bowie knife,or a pistol, .or a sling-shot,or other instrument useful in combat only. But the rule as stated admits of no consideration being given to such varying circumstances of such widely different significance.
The charge in other respects is exceptionally lucid, comprehensive, correct] and fair. Though the court might properly have called especial attention to the youth and limited experience of the prisoner, in connection with that part of his charge on the subject of self-defense and acts done through apprehension of apparent danger, we do not think the circumstances sufficiently marked to call for special instructions on this head. We do not think the court? *251 erred in omitting such special instructions. We find no-other error in the record than that indicated.
J. K. Hamilton, JohnF. Kumler, and Frank M, Salar for Plaintiffs.
. Charles F. Sumner, for State.
As the case must go back to be re-tried, we make no further remark upon the weight or sufficiency of the evidence-than this, that we cannot say that the evidence on behalf of the State, if believed, is not susceptible of an interpretation that would justify a verdict of murder in the second degree, though this would seem to require the giving of great, and possibly undue weight, to the testimony of the witness Maude Hall, and the circumstance of the use of a pocket-knife asá weapon. We do not wish to be understood as intimating that in our opinion the testimony of Maude Hall, or the case of the State,is weakened materially by the testimoiy of the-other witnesses of this homicide, produced on behalf of the plaintiff in error; it is evident that they are -not superior in life or character to the witness Maude Hall, and most of them are interested, because of relationship, in screening-Ira Bailus, and their stories that they were absent, or were not giving attention, at the moment immediately preceding that when Peters struck Bailus, are open to suspicion of partial falsity, to say the least of it;, but the weakness of the defense in this respect does not strengthen the State,and it must be borne in mind that the State must make out its cáse affirmatively beyond a reasonable doubt.
It does not appear to us that the defense of self-defense was fairly established by the weight of the evidence,or that the homicide was justifiable or excusable on any ground.
For the reasons stated, the judgment of the court of common pleas will be reversed and the verdict set aside, and the case remanded for a new trial.