## JAMES W. ERWIN v. THE STATE OF OHIO.

1. Where an application is made for a discharge, under section 162 of the criminal code (66 Ohio L. 311), at any term of the court, on the ground that the defendant, who had given bail for his appearance, was not brought to trial before the end of the third term after the indictment was found, such application should be refused, if at such term the state is ready for trial, although the cause can not be tried for want of time at such term.

2. Where, on the trial of a criminal cause, a juror is challenged by the defendant for cause, and the challenge is improperly refused; but such juror is afterward excused on a peremptory challenge, the judgment will not be reversed for such error, if an acceptable jury be impaneled before the defendant has exhausted his right to peremptory challenges. (*Mimms* v. *The State*, 16 Ohio St. 221.)

3. Intention or purpose to kill may be present in the crime of manslaughter, where the killing is without malice upon a sudden quarrel.

4. Where death is caused by the use of a deadly weapon, and the circumstances of the killing are detailed to the jury, some of which tend to disprove a malicious or intentional killing, it is misleading to charge

the jury "that in *this* case the law raises a presumption of malice in the defendant, and an intent on his part to kill the deceased."

5. Where a person in the lawful pursuit of his business, and without blame, is violently assaulted by one who manifestly and maliciously intends and endeavors to kill him, the person so assaulted, without retreating, although it be in his power to do so without increasing his danger, may kill his assailant if necessary to save his own life or prevent enormous bodily harm.

ERROR to the Court of Common Pleas of Gallia county.

Several assignments for error set out in the record are not specially mentioned in the opinion of the court.

The case is sufficiently stated in the opinion of the court.

*S. A. Nash*, for the plaintiff in error:

I. The challenge for cause should have been sustained. *Frazie* v. *The State*, 23 Ohio State, 551.

II. The court erred in its charge as to the presumption of intent. *Fonts* v. *The State*, 8 Ohio St. 98; *Robbins* v. *The State*, Ib. 131; *Kain* v. *The State*, Ib. 306; *Hagan* v. *The State*, 10 Ib. 459; *Shaeffner* v. *The State*, Ib. 598; *Rufer* v. *The State*, 25 Ib. 464; 1 Archb. 87, 118, 215; 1 Wharton, 292, 631; Wright, 499; Foster's C. L. 255; *Commonwealth* v. *York*, 9 Met. 116; *Same* v. *Webster*, 5 Cush. 305; 1 Gray, 61; *State* v. *Patterson*, 45 Vt. 308; 42 N. Y. 165; 5 Iowa, 433; *State* v. *Murphy*, 33 Iowa, 270; *State* v. *Porter*, 34 Ib. 131; 10 Mich. 212; *Patten* v. *The People*, 18 Mich. 314; *Head* v. *The State*, 44 Miss. 731.

The construction given to our statute of murder in the first and second degree, in making the intent in giving the mortal wound an essential ingredient of the charge, demands of the state undoubted proof of that intent before calling upon the defendant to meet the case made against him.

III. On the subject of "retreating." 2 Bishop, secs. 624, 632, 633; *Stoffer* v. *The State*, 15 Ohio St. 47; Foster's C. L. Cases, 274; 1 East. 271; *Oliver* v. *The State*, 17 Ala.

587; *State* v. *Harris*, 1 Jones (N. C.), 190; 9 Iowa, 188; 20 Ib. 569; 8 Mich. 150; 7 Humph. 429; *People* v. *Sullivan*, 3 Selden, 396; *State* v. *Baker*, 1 Jones (N. C.), 276; *The State* v. *Kennedy*, 7 Nevada, 374; 8 Bush, 481; 2 Duval, 328; *Marts* v. *The State*, 26 Ohio St. 162; 25 Texas, 174; 24 Ind. 151; *Shorter* v. *The People*, 2 Comst. 193; *Campbell* v. *The People*, 16 Ill. 17; 23 Ib. 17; 24 Ib. 241; 14 B. Mon. 615; 18 Ib. 49; *State* v. *Sloan*, 47 Mo. 604; 3 Minn. 270; 17 Ala. 587; 32 Conn. 75.

*Simeon Nash*, also for plaintiff in error, filed a brief urging substantially the same points as those made by S. A. Nash.

*John Little*, attorney-general, for the state :

1. The indictment is good.  *Loeffner* v. *The State*, 10 Ohio St. 598.

2. The defendant was not prejudiced by the refusal of the court to sustain the defendant's challenge for cause, for the reason that the peremptory challenges were not exhausted. Code of Criminal Procedure, sec. 90.

3. The doctrine stated by the court below in its charge as to presumptions of malice and intent to kill is law in Ohio.  *Silvers* v. *The State*, 22 Ohio St. 99; Wight, 20.

4. As to the doctrine that the burden of proof is upon the defendant to show justification in self-defense, etc., the homicide being established, see *Selvers* v. *The State*, 22 Ohio St. 99; 24 Ohio St. 584.

5. The doctrine of " retreating to the wall " is undecided in Ohio.  The law, it seems to me, should be decided to be that which would best protect human life.

McILVAINE, J.   The plaintiff in error was indicted for the crime of murder in the first degree at the February term, 1872, of the Court of Common Pleas of Gallia county. At the succeeding term, in May of the same year, a trial was had which resulted in a verdict of guilty of murder in the second degree.   This verdict was set aside by the court.

and the defendant was admitted to bail. At the March term, 1876, he was again put upon trial, convicted, and sentenced for murder in the second degree.

At the several terms of the court intervening between May, 1872, and the October term, 1875, the cause was continued without objection on the part of the defendant, who, from time to time, gave bail for his appearance as required by the court.

At the last-named term, to-wit: on the 13th day of September, 1875, the defendant moved the court for his discharge under section 162 of the criminal code (66 Ohio L. 311), which provides as follows : " If any person indicted for any offense, who has given bail for his appearance, shall not be brought to trial before the end of the third term of the court in which the cause is pending, held after such indictment is found, he shall be entitled to be discharged, so far as relates to such offense, unless the delay happen on his application, or be occasioned by the want of time to try such cause at such third term." Two days thereafter, to-wit : on the 15th of the month, the same being the last day of the term, and the state being then ready to proceed to trial, this motion was overruled by the court and the cause continued, for the reason that there was no time to try the cause at that term.

When the above section is considered with section 163, following, it is clear that a defendant can not be discharged for the reason stated, except upon an application to the court during a term thereof; and when an application is made at a term when the state is ready to proceed to trial, but the cause can not be tried at such term for want of time, the discharge should not be ordered. See *Ex parte McGhehan*, 22 Ohio St. 442.

2. Upon the last trial, several persons named in the special *venire* for thirty-six jurors were examined under oath as to their qualifications as jurors, who stated severally that they had formed and expressed an opinion as to the guilt or innocence of the defendant from reading a report of the testimony of witnesses offered on the former trial of the

case.    Thereupon the defendant challenged such jurors for cause. But it appearing from further examination of such jurors that they felt themselves able, notwithstanding such opinion, to render an impartial verdict upon the law and evidence, the court refused the challenges for cause. These challenges should have been sustained.  Such jurors are not rendered competent by section 134 of the criminal code, as amended February 10, 1872 (69 Ohio L. 11) ; *Fra-.zie* v. *The State*, 23 Ohio St. 551.

It appears from the record, however, that each of these objectionable jurors was afterward excused on a peremptory challenge, and that a full panel of impartial and acceptable jurors was obtained from the persons named in the special venire, before the defendant had exhausted his right of peremptory challenge, so that, in fact, no prejudice resulted to defendant from such erroneous ruling of the court.  See *Mimms* v. *The State*, 16 Ohio St. 221.

3. The alleged death was caused by a shot from a pistol, and the testimony tended to show that the homicide was committed by defendant upon a sudden quarrel, and in defense of his person and his property.

The charge in the indictment included murder in the .second degree and manslaughter.  The court properly defined these crimes to the jury substantially in the words of the statute, namely : " That if any person shall purposely and maliciously, but without deliberation and premeditation, kill another, every such person shall be deemed guilty of murder in the second degree," and, " That if any person ·shall unlawfully kill another without malice, either upon a sudden quarrel or unintentionally, while the slayer is in the commission of some unlawful act, every such person shall be deemed guilty of manslaughter." Whereupon the court said to the jury, You will see that the difference between manslaughter and murder in the second degree " is the absence of malice *and* purpose to kill." And thereupon ·the court proceeded to charge as follows : " If you find from the evidence that the defendant used a deadly weapon *in this case,* and that death ensued from the use of such

deadly weapon, then the law raises the presumption of malice *in the defendant*, and also an intent *on his part* to kill the decedent."

We can well see how the jury, under these instructions, may have been led to convict the defendant of murder in the second degree, though guilty of manslaughter only, or even though not guilty of any crime whatever. It was plainly inferable, from the first instruction above stated, that-the defendant's crime was not manslaughter, if the killing were intentional. Such is not the law of manslaughter. If the killing be unlawful, but without malice, as upon a sudden quarrel, although intentional, the crime is nevertheless manslaughter only. It is true that the jury must have found the presence of malice as well as purpose to kill; but having first found the purpose to kill as we may suppose, they entered on the inquiry as to malice, under the influence of an instruction, that the defendant was guilty of murder or not guilty of any crime whatever : thus exposing the defendant to a moral influence against him, which should not have had lodgment in the minds of the jurors.

But the latter instruction, though not so clearly erroneous, was more palpably prejudicial to the defendant as misleading to the jury. As an abstract proposition, where the circumstances of a homicide are not known, further than the mere fact that the death was caused by the use of a deadly weapon, we do not deny that the jury may, from such fact alone, infer both malice and a purpose to kill. But where the attending circumstances are shown in detail, some of which tend to disprove the presence of malice or purpose to kill, it is misleading and erroneous to charge a jury that in such a case the law raises a presumption of malice and intent to kill from the isolated fact that death was caused by the use of a deadly weapon. In such case the presence of malice or intent to kill must be determined from all the circumstances proven, including, of course, the character of the weapon. It may indeed be said, with much reason, that the use of a deadly weapon in the taking of

life raises the same presumptions whether other attending circumstances be shown or not; and that when other facts and circumstances are shown, they either strengthen or rebut the presumptions so arising from the character of the weapon.

The question before us, however, is not one of mere logic; but rather, how would jurors of ordinary understandings interpret and reason upon such a charge? The instruction was, "If you find from the evidence that the *defendant* used a deadly weapon *in this case*, and that death ensued from the use of such deadly weapon, then *the law* raises the presumption of malice *in the defendant*, and also an intent *on his part* to kill the decedent." This was not an abstract proposition. It covered the case before the jury. And in our opinion, a jury of ordinary intelligence might well understand that the law fixed the guilt of the defendant as a murderer, if the evidence showed that he took the life of the deceased by the use of a deadly weapon, without regard to other circumstances; save only, as they were told in another part of the charge, that he might, under certain circumstances, justify on the ground of self-defense. But our objection to the charge is independent of all questions of self-defense, and relates to it solely as bearing on the case which the state was bound to prove in order to entitle it to a conviction.

4. It is also claimed that the court below erred in charging the jury as to the law of self-defense.

The case shows that the defendant and the deceased, his son-in-law, resided upon lands belonging to the defendant, in different houses, situated a short distance apart. Between their houses, but not within the curtillage of either, there was a corn-crib and shed suitable for the storage of grain and farming implements. This building was situate in a field cultivated by the deceased as a cropper, and had been used by him for the storage of grain, and also by the defendant for the storage of his farming tools. A controversy arose between the parties as to the right of possession of the building. Shortly before the homicide, the defendant's tools had been thrown out of this shed, and were re-

placed and secured by chains and locks. These chains were afterward broken. On the day of the homicide, the defendant was in the shed securing his tools, and the deceased was near his own house, and close by, when angry words passed between them; whereupon the deceased, with an ax on his shoulder, approached the shed in a threatening manner, and when near it, the defendant warned him not to enter. Without heeding this warning, the deceased advanced to the eve of the shed, perhaps within striking distance of the defendant, when the latter shot him with a pistol, inflicting a wound from which death soon followed. Testimony was offered on the trial, more or less conflicting as to previous bitter feelings between the parties, also as to the threatening attitude of the deceased at the time of the shooting, and as to the defendant's facilities for retreat from the place occupied by him at the time.

The portion of the charge complained of was as follows: "If you find, from the greater weight of the evidence, that the defendant was, at the time the fatal shot was fired, in the lawful pursuit of his business, and he was attacked by the deceased under circumstances which denote an intention to take away his life, or to do him some great bodily harm, he may lawfully kill his assailant; provided he use all means *in his power* otherwise to save his own life or to prevent the intended harm; such as retreating as far as he can, or disabling his adversary, without killing him, *if it be in his power*. But if the attack upon him is so sudden, fierce, and violent, that a retreat would not diminish, but increase, his danger, he may kill his adversary without retreating; and further, if you find, from the evidence, that from the character of the attack there was reasonable ground for the defendant to believe, and from the evidence you find the defendant did honestly believe, that his life was about to be taken, or he was to suffer great bodily harm, and that he believed honestly that he would be in equal danger by retreating, then, if he took the life of the assailant, he would be excused."

The contention, on the part of the plaintiff in error, is

that the court below erred in the application of the doctrine of "retreating to the wall." The question here presented has not been decided in any of our reported cases, although it has been often raised and variously determined in our *nisi prius* courts. It may be said, indeed, that learned courts and able text-writers have left the question in some obscurity. The true solution must, undoubtedly, be determined upon the principles of the common law; and such is the present state of the authorities, that it seems necessary to examine the books of the law written at a period before the apparent or real confusion had an existence.

When the common law had become a system as nearly perfect as human reason could make it, homicide *se defendendo* was either justifiable or only excusable. This distinction was clearly recognized. In speaking of manslaughter, Lord Coke (3 Institute, 55) says: "Some be voluntary, yet being done upon inevitable cause, are no felony—as if A be assaulted by B, and they fight together, and before any mortal blow be given, A giveth back until he cometh to a hedge, wall, or other strait, beyond which he can not passe, and then, in his own defense and for safeguard of his own life, killeth the other; this is voluntary, and yet no felony; and the jury that finde that it was done *se defendendo*, ought to finde the special matter. And yet such a precious regard the law hath of the life of man, though the cause be inevitable, that, at the common law, he should have suffered death; and, though the statute of Gloccster save his life, yet he shall forfeit all his goods and chattels. . . . If A assault B so fiercely and violently and in such manner as if B should give back, he should be in danger of his life, he may, in this case, defende himselfe; and if, in that defense, he killeth A, it is *se defendendo*." And on page 56, speaking of the same subject, he says: "Some, without giving back to a wall, etc., or other inevitable cause, as if a thief offer to rob or murder B either abroad or in his house, and thereupon assault him, and B defende himselfe without giving back, and in his defense killeth the thiefe,

this is no felony ; for a man shall never give way to a thiefe, .etc., neither shall he forfeit anything."

Sir Mathew Hale, speaking of homicide *ex necessitate* (1 Hale's Pleas of the Crown, chap. 40), says that homicide in .defense of a man's own life, which is usually styled *se defendendo*, is of two kinds : "1. Such, as though it excuseth from death, yet it excuseth not the forfeiture of goods, nor is the party to be absolutely discharged from prison, but bailed, and to purchase his pardon of course. 2. Such as wholly acquits from all kinds of forfeiture." He defines homicide *se defendendo* to be " the killing of another person in the necessary defense of himself against him that assaults him ;" and states the rule as follows : " 3. Regularly it is necessary that the person that kills another in his own defense fly as far as he may to avoid the violence of the assault before he turn upon his assailant ; for in cases of hostility between two nations, it is a reproach and piece of cowardice to fly from an enemy ; yet in cases of assaults .and affrays between subjects under the same law, the law owns not any such point of honor, because the king and his laws are to be the *vindices injuriarum*, and private persons are not trusted to take capital revenge one of another. But this hath some exceptions : •

" 1. In respect of the person killing. . . . 2. In respect to the person killed. If a thief assaults a true man either abroad or in his house to rob or kill him, the true man is not bound to give back, but may kill the assailant, .and it is not felony."

About a century later (1762), Mr. Justice Foster, in his admirable discourse on the law of homicide founded in necessity (Foster's Crown Cases, chap. 3, p. 273, *et seq.*), says : " Self-defense naturally falleth under the head of homicide founded in necessity, and may be considered in two different views. It is either that sort of homicide, *se et sua defendendo*, which is perfectly innocent and justifiable, or that which is in some measure blamable and barely excusable. The want of attending to this distinction hath, I believe, thrown some darkness and confusion upon this part of the

law. The writers on the crown-law, who, I think, have
not treated the subject of self-defense with due precision,
do not, in terms, make the distinction I am aiming at; yet
all agree that there are cases in which the man may, without
retreating, oppose force to force, even to the death. This
I call justifiable self-defense. They, justifiable homicide.
They likewise agree that there are cases in which the de-
fendant can not avail himself of the plea of self-defense
without showing that he retreated as far as he could with
safety, and then, merely for the preservation of his own
life, killed the assailant. This I call self-defense, culpable,
but, through the benignity of the law, excusable. In the
case of justifiable self-defense, the injured party may repel
force with force in defense of his person, habitation or
property, against one who manifestly intendeth and en-
deavoreth, with violence or surprise, to commit a known
felony upon either. In these cases he is not obliged to re-
treat, but may pursue his adversary till he findeth himself
out of danger, and if, in a conflict between them, he hap-
peneth to kill, such killing is justifiable."

In 1803, Mr. East published his excellent Treatise of the
Pleas of the Crown, and, on page 271, says, in speaking of
homicide from necessity : " Herein may be considered, 1.
What sort of attack it is *lawful* and *justifiable* to resist, even
by the death of the assailant, and where the party is *without
blame.* 2. Where such killing is only excusable, or even
culpable, and the party is not free from blame," etc.

In relation to the first sort, the author says : " 1. A man
may repel force by force, in defense of his person, habita-
tion, or property, against one who manifestly intends and
endeavors, *by violence or surprise,* to commit a *known felony,*
such as murder, rape, robbery, arson, burglary, and the like,
upon either. In these cases he is not obliged *to retreat,* but
may pursue his adversary until he has secured himself from
all danger ; and if he kill him in so doing it is called justi-
fiable self-defense ; as, on the other hand, the killing by
such felon of any person so lawfully defending himself will
be murder. But a bare fear of any of these offenses, how–

ever well grounded, as that another lies in wait to take away the party's life, unaccompanied with any overt act indicative of such an intention, will not warrant in killing that other by way of prevention. There must be an actual danger at the time."

In this connection, it is hardly necessary to add, much less to cite authority to show that a homicide, which can not be *justified* under the foregoing rules, can not be *excused* unless the slayer shows that before the mortal blow was given he had retreated as far as he safely could ; and that he killed his adversary solely from the necessity which then existed, in order to save himself from immediate death or enormous bodily harm.

Shortly after the publication of Mr. East's treatise, the case of the *Commonwealth* v. *Selfridge*, a leading case in the United States, was tried in the supreme judicial court of Massachusetts, in the year 1806. The charge by the court below, as above copied, was a substantial transcript of the propositions announced by Justice Parker in his charge to the jury in Selfridge's case (Selfridge's Trial, 160). In order to fully understand and apply the doctrine of Selfridge's case, it must be observed that Justice Parker assumed in his charge to the jury that Selfridge was not free from blame in provoking the assault from young Austin, for whose death he was upon trial. The deceased had taken upon himself the quarrel of his father, whom the defendant had but recently posted. I quote from the charge : " Who was originally in the wrong it is not for me to say; but I feel constrained to say that whatever provocation the defendant may have conceived to have been given him, and however great the injury the deceased's father may have done him, he certainly proceeded a step too far in making the publication which came out in the morning of this unhappy disaster. To call a man a coward, liar, and scoundrel in the public newspapers, and to call upon other printers to publish the same, is not justifiable under any circumstances whatever. Such publication is libelous in its very nature, as it necessarily excites

to revenge and ill blood." It also appears in the case that Selfridge anticipated an assault from some one on account of the publication, and had armed himself with a pistol, with which he shot the deceased immediately upon being assaulted with a cane. Such being the case, we do not understand that the right to defend, even unto death, without retreating, against a felonious assault, where the assaulted party was without fault, was intended to be denied by the learned judge. Indeed, in the charge we find the following: "Numerous authorities, ancient and modern, have been read to you upon this subject." (Homicide *se defendendo*, both justifiable and excusable.) "Were it necessary for you to take those books with you, and compare the different principles and cases which have been cited, your minds might meet with some embarrassment, there being in some instances an apparent, though in none a real incongruity." If anything further was needed to show that Justice Parker in his charge intended to limit the duty of "retreating" to cases of excusable killing in self-defense, and did not intend to extend the duty to cases of justifiable killing, it might be implied from the fact that in the previous month he was present with all the judges when Chief Justice Parsons charged the grand jury who indicted Selfridge as follows: "A man may repel force by force in defense of his person against any one who manifestly intends, or endeavors by violence or surprise, feloniously to kill him. And he is not obliged to *retreat*, but may pursue his adversary until he has secured himself from all danger; and if he kill him in so doing, it is *justifiable self-defense*. But a bare fear, however well grounded, unaccompanied by any overt act indicative of such intention, will not warrant him in killing. There must be an actual danger at the time. And (in the language of Chief Justice Hale) it must plainly appear by the circumstances of the case, as the manner of the assault, the weapon, etc., that his life was in imminent danger, otherwise the killing of the assailant will not be *justifiable homicide*. But if the party killing had reasonable grounds for believing that the

person slain had a felonious design against him, although it should afterward appear that there was no such design, it will not be murder, but will be either manslaughter or *excusable* homicide, according to the degree of caution and the probable grounds for such belief. These principles have been recognized by the. wisest and most humane writers on criminal law."

By observing the distinction between justifiable and ex-' cusable homicide *se defendendo*, as stated in the authorities above quoted, much of the discrepancy in the decisions of the courts where the common law prevails is made to disappear: most of the cases upon the facts being such as would only *excuse* the killing.

It is true, under our constitution, whether the killing in self-defense be justifiable or excusable, there must be an entire acquittal, for the reason that there is no forfeiture of goods in cases of excusable homicide. But this is no reason why the difference between the cases as to the duty of retreating to the wall should be ignored. The taking away of the forfeiture in cases of excusable homicide did not relieve the party in such case from the duty of retreating, nor did it impose such duty in cases where it was not before required.

It is true that all authorities agree that the taking of life in defense of one's person can not be either justified or excused, except on the ground of *necessity;* and that such necessity must be imminent at the time; and they also agree that no man can avail himself of such necessity if he brings it upon himself. The question, then, is simply this: Does the law hold a man who is violently and feloniously assaulted responsible for having brought such necessity upon himself, on the sole ground that he failed to fly from his assailant when he might have safely done so? The law, out of tenderness for human life and the frailties of human nature, will not permit the taking of it to repel a mere trespass, or even to save life, where the assault is provoked; but a true man, who is without fault, is not obliged to fly from an assailant, who, by violence or sur-

prise, maliciously seeks to take his life or do him enormous bodily harm.

Now, under the charge below, notwithstanding the defendant may have been without fault, and so assaulted, with the necessity of taking life to save his own upon him, still, the jury could not have acquitted, if they found he had failed to do all in his power otherwise to save his own life, or prevent the intended harm, as retreating as far as he could, etc. In this, we think, the law was not correctly stated.

The suggestion, by the attorney-general, that that rule should be declared the law which is best calculated to protect and preserve human life, is of great weight, and we can safely say, that the rule announced is, at least, the surest to prevent the occurrence of occasions for taking life; and this, by letting the would-be robber, murderer, ravisher, and such like, know that their lives are, in a measure, in the hands of their intended victims.

Of course, there is nothing in this opinion which will be understood as withdrawing from the jury the determination of every question of fact involved in an issue of *se defendendo*. Whether, under the law as here laid down, and such other rules as may be applicable to any particular case, a necessity existed, at the time, to take life in order to save life or prevent enormous bodily harm, as well as the question, whether the killing, under the circumstances of each case, was prompted solely by such necessity, or by other motives, is to be determined by the jury in each case.

*Judgment reversed, and cause remanded for further proceedings.*