DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from the judgment of the Sandusky County Court of Common Pleas which, following a jury trial, found appellant, Douglas S. Langley, guilty of murder, with a firearm specification, in violation of R.C. 2903.02, and gross abuse of a corpse, in violation of R.C. 2927.01(B), a felony of the fifth degree. The incidents for such offenses occurred on or about February 17, 2002. Appellant was sentenced on October 1, 2002, to an indefinite term of 15 years to life for the murder conviction, with 3 years for the firearm specification, and 12 months for gross abuse of a corpse. The sentences were ordered to be served consecutively for a total prison term of 19 years to life. For the reasons that follow, we affirm appellant's convictions, but reverse and remand the matter to permit the trial court to make the required statutory findings with respect to the gross abuse of a corpse sentence.
 {¶ 2} Appellant raises the following assignments of error on appeal:
 {¶ 3} "Assignment of Error No. 1: The trial court committed prejudicial error when it refused to give defendant's requested instruction that `the defendant had no duty to retreat.'
 {¶ 4} "Assignment of Error No. 2: The trial court committed error in denying the motion for judgment of acquittal as to count three, gross abuse of a corpse.
 {¶ 5} "Assignment of Error No. 3: The jury's verdict of guilty on count three, abuse of a corpse, was against the manifest weight of the evidence and the evidence on that count was insufficient to support the conviction.
 {¶ 6} "Assignment of Error No. 4: The trial court erred in imposing the maximum prison term for the fifth degree felony, abuse of a corpse, without making the findings mandated by statute to (1) overcome the presumption against incarceration and (2) justify a maximum prison term.
 {¶ 7} "Assignment of Error No. 5: The trial court erred in sentencing Mr. Langley to consecutive terms of imprisonment for counts one and three without making the requisite findings."
 {¶ 8} Appellant argues in his first assignment of error that the trial court committed prejudicial error when it refused to give an instruction that "the defendant had no duty to retreat." Specifically, appellant argues that he shot and killed the victim in this case, Tim Broski, in self-defense, while appellant was in lawful pursuit of his business. As such, in addition to the general jury instruction regarding self-defense, appellant requested that the jury also be instructed as to the following:
 {¶ 9} "[I]f the Defendant was assaulted in his business, the Defendant had no duty to retreat or escape and could use such force, such means as are necessary to repel the assailant from the business even to the use of deadly force, provided that he had reasonable grounds to believe and an honest belief that the use of deadly force was necessary to repel the assailant."
 {¶ 10} The trial court, however, refused to instruct the jury that appellant had no duty to retreat and held that "the circumstances are not such and the evidence is not such as to satisfy that there was a business that would entitle the Defendant to the business instruction." We agree with the trial court.
 {¶ 11} In order to establish self-defense, appellant must establish, by a preponderance of the evidence, each of the following elements:
 {¶ 12} "* * * (1) the slayer was not at fault in creating the situation giving rise to the affray; (2) the slayer has a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the slayer must not have violated any duty to retreat or avoid the danger." State v.Robbins (1979), 58 Ohio St.2d 74, paragraph two of the syllabus. See, also, State v. Jackson (1986), 22 Ohio St.3d 281, 284.
 {¶ 13} Generally, a person has a duty to retreat from danger unless he is in his home or business. See Jackson, supra at 284, citing Robbins, supra. With respect to the business exception, the Ohio Supreme Court has stated, "[w]here a person in the lawful pursuit of his business, and without blame, is violently assaulted by one who manifestly and maliciously intends and endeavors to kill him, the person so assaulted" has no duty to retreat, even though it may be within his power to do so, and "may kill his assailant if necessary to save his own life or prevent enormous bodily harm." Erwin v. State (1876),29 Ohio St. 186, paragraph five of the syllabus. See, also, Graham v.State (1918), 98 Ohio St. 77, 79.
 {¶ 14} In order to overturn his conviction based upon the trial court's failure to provide the jury with his proposed instruction, appellant must establish that the trial court's alleged error was prejudicial. In Jackson, the Ohio Supreme Court held that the elements of self-defense are cumulative and, as such, each element must be established by a preponderance of the evidence before a defendant can succeed on a claim of self-defense. Jackson, supra, at 284, citing Robbins, supra. Accordingly, although the court in Jackson held that "a special instruction on appellant's duty to retreat when attacked in or about his home may have been helpful to the jury," it nevertheless found that the trial court's failure to provide such an instruction was not prejudicial to appellant because appellant was incapable of proving each element of self-defense. Specifically, because Jackson failed to establish that he was in imminent danger of death or great bodily harm from the victim, the court held that any error by the trial court in failing to instruct the jury that Jackson had no duty to retreat in his own home was harmless. The court stated:
 {¶ 15} "In order to prevail on the issue of self-defense, the accused must show that he was not at fault in starting the affray, and that he had a bona fide belief that he faced imminent danger of death or great bodily harm and that his only means of escape was the use of such force, and that he violated no duty to retreat or avoid the danger. If the defendant fails to prove any one of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense. [Emphasis in original.]" Jackson at 284.
 {¶ 16} In this case, appellant directs this court's attention to State v. Hughes (Nov. 29, 1988), Ross App. No. 1463, wherein the Fourth Appellate District reversed a conviction and remanded the matter for a new trial on the basis that the trial court failed to instruct the jury that the appellant in that case had no duty to retreat. In Hughes, the court held that the trial court's failure to instruct the jury that Hughes, a disc jockey in a bar, had no duty to retreat from his assailant, was prejudicial to the appellant. Id. We note, however, that, but for the issue of his duty to retreat, Hughes was capable of establishing all the other elements of self-defense. We find thatHughes is factually distinguishable from the case at hand
 {¶ 17} In this case, appellant was acting as sergeant at arms of the Fremont chapter of the Iron Coffins' Motorcycle Club. As the sergeant at arms, he had the duty of keeping the peace, order, and safety of the persons in the clubhouse. Insofar as the president of the chapter was not present at the time of the incident, appellant was the highest ranking member in the clubhouse. By all accounts, the clubhouse was a social club and was not open to the general public. In fact, the door to the clubhouse was locked at all times and only club members or persons having some connection with the club members were permitted access to the club. Although there was some suggestion that beer and liquor drank on the premises had to be paid for by the consumer, there was no evidence establishing that this was an actual business, as opposed to merely a place for members and friends of members to socialize. Moreover, there was no evidence presented that indicated that appellant, although highest ranking member on the premises at the time, was "in the lawful pursuit of his business" when he shot and killed the victim in this case.
 {¶ 18} In addition to there being no evidence that appellant was pursuing any "business" at the time of this shooting, there is also evidence to suggest that appellant was, to a large extent, at fault for creating the situation giving rise to the affray. By all accounts, the victim, Broski, was highly intoxicated and belligerent while in the club. During the course of the evening, Broski was assaulted by appellant and Dean Davis, secretary of the Iron Coffins, and was ejected from the club. Despite his earlier aggressive behavior, upon Broski's apology, appellant allowed him back into the club. According to Davis and appellant, Broski continued to "run his mouth," wanting to fight.
 {¶ 19} At some point after Davis and appellant assaulted Broski, and let him back in, Joe Camp arrived at the clubhouse. In pertinent part, Camp testified that appellant began verbally "poking" at Broski, asking him if he was going to act up again. Eventually, during the argument between Broski and appellant, Broski brought up the fact that he had a knife. Camp testified that appellant stated to Broski that if he "had a knife * * * he would shove it up his ass," to which Broski replied, "Well, you have a lot of work to do because it's a pretty good knife." Camp then testified that appellant ordered Broski to go get his knife, but Broski refused. Appellant then ordered Davis to get the knife out of Broski's vehicle. According to Camp, while Davis was outside, appellant unlocked the gun cabinet behind the bar, pulled out a shotgun, loaded it, and placed it down under the bar.
 {¶ 20} According to appellant, Camp, and others, Davis returned without a knife. Appellant then went out to Broski's vehicle to retrieve it himself. Appellant found Broski's machete and brought it into the clubhouse, laying it on the bar in front of Broski. Appellant testified that he was preparing to secure the machete in the weapons locker, but when he turned around Broski was holding the machete. Appellant testified that he "wouldn't agree with somebody standing there with a weapon in [Broski's] demeanor" and therefore told Broski to put the knife down. According to appellant, he wanted to lock up the machete; however, Broski refused.
 {¶ 21} Appellant then testified that he got the shotgun from under the register, which he claimed he did not put there or load, cocked it, and stuck it in Broski's face. Once appellant stuck it into Broski's face, Broski's wife grabbed the barrel of the shotgun. According to appellant, Davis and Camp pulled her off of the gun. When appellant turned back toward Broski, appellant testified as follows:
 {¶ 22} "Q. And when you pulled the gun away from her, what did you do with it?
 {¶ 23} "A. Well, I'm turning back around and Tim's standing there, he's got the knife. He went back like this (indicating).
 {¶ 24} "Q. What happened?
 {¶ 25} "A. I aimed the gun at him and shot him.
 {¶ 26} "Q. Why did you fire the gun?
 {¶ 27} "A. Because he was going to hit me with the machete."
 {¶ 28} Camp testified to a much different version of events. According to Camp, while the machete was lying on the bar, appellant yelled at Broski to "Pick up the knife, pick up the knife," but that Broski refused. Broski then "made a movement with his hand and [appellant] reached under the bar and pulled out the shotgun and started jamming it in [Broski's] face and ordering him * * * to pick up the knife." Camp then testified that Broski's wife grabbed the barrel of the shotgun. As she and appellant were fighting with it, Camp stated that it swung over toward him and he was "looking down both barrels of the gun," at which point he began running toward the other end of the bar. While he was turned away, Camp heard the gun fire.
 {¶ 29} Other witnesses provided varying accounts of the shooting, but no one other than appellant testified that the victim was menacingly brandishing the machete. Nevertheless, even if we accept appellant's version of events as true, we find that appellant's version fails to establish that appellant was not at fault in causing the affray. According to appellant, he allowed Broski back into the clubhouse, knowing that he was behaving in an aggressive and belligerent manner. Once Broski was back inside, appellant continued to verbally engage him in an argument. When Broski stated he had a knife in his vehicle, which was located on the street outside of the locked and secured clubhouse, appellant brought in the machete and placed it on the bar in front of Broski. Although appellant testified that Broski was holding the machete before appellant raised the shotgun, it was only after appellant stuck the shotgun in Broski's face and struggled with Broski's wife over the shotgun, that Broski allegedly wielded the machete in a threatening manner toward appellant.
 {¶ 30} In order for a defendant to prevail on a claim of self-defense, "the combat [leading to the death of another] must not have been of [the defendant's] own seeking, and he must not have put himself in the way of being assaulted, in order that when assaulted and hard pressed, he might take the life of his assailant." Stewart v. State (1852), 1 Ohio St. 66, 72. InStewart, the Ohio Supreme Court held that it was immaterial that the trial court failed to instruct the jury that the defendant had no duty to retreat because, based on the evidence in that case, the court found that Stewart had dunned the victim "for the purpose of bringing on an affray in order to afford [Stewart] a pretext to stab his enemy." Id. at 75.
 {¶ 31} Based on the facts in this case, as presented by appellant, we find that appellant sought to bring on the affray with the victim, Tim Broski. By appellant's own account, he was antagonistic, provided Broski with the machete, stuck a loaded shotgun in Broski's face, and struggled with Broski's wife over the shotgun. Only after all of this did Broski then allegedly raise the machete in a threatening manner toward appellant. Accordingly, we find that appellant put himself in the way of being assaulted, was at fault for creating the situation which gave rise to the affray, and was not otherwise blameless. SeeRobbins, supra at paragraph two of the syllabus; Jackson,
supra at 284; and Erwin, supra at paragraph five of the syllabus.
 {¶ 32} Insofar as appellant failed to establish the first element of self-defense, even assuming arguendo that appellant was entitled to a special instruction regarding his duty to retreat, we find that any alleged error on the part of the trial court was harmless. See Jackson, supra. As such, we find appellant's first assignment of error not well-taken.
 {¶ 33} Appellant argues in his second assignment of error that the trial court erred in denying the motion for judgment of acquittal as to Count 3, gross abuse of a corpse. We disagree.
 {¶ 34} R.C. 2927.01(B), Abuse of a Corpse, states: "No person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities."[1]
 {¶ 35} Crim.R. 29(A), Motion for Acquittal, provides, in pertinent part:
 {¶ 36} "The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. * * *"
 {¶ 37} The Supreme Court has interpreted Crim.R. 29(A) inState v. Bridgeman (1978), 55 Ohio St.2d 261, syllabus, as follows:
 {¶ 38} "Pursuant to Crim. R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt."
 {¶ 39} In this case, the victim's torso was found inside a garbage bag. According to Dean Davis and appellant, Davis handed appellant a garbage bag to use to cover the body. According to appellant, he looked for something other than a garbage bag, but nothing else was available. He also testified that he used the garbage bag because blood was coming out of the body. Appellant, however, stated that he only placed the garbage bag partially over the victim's head, but because blood was starting to come out of the bag, Davis pulled the garbage bag the rest of the way over the victim's torso.
 {¶ 40} In addition to a garbage bag being pulled over the victim's torso, there was evidence that appellant poured whiskey and tequila on and around the victim's body. Camp testified that after Broski's wife left the clubhouse, appellant dumped whiskey and tequila on the victim's body. Additionally, although Davis could not recall at trial that appellant did anything to the body with a bottle of whiskey, Davis verified that he had stated earlier to the police that appellant dumped whiskey around the body just before allowing Davis to call 9-1-1:
 {¶ 41} "Q. Do you remember in your third interview with detectives on the 22nd of February in response to question, you stated that, `I also remember now bringing that up, Doug wanted the bottle of whiskey, I don't know what for, he was dumping them out by the body.' Do you remember that?
 {¶ 42} "A. I might have said that. Sounds familiar."
 {¶ 43} Moreover, despite appellant's assertion that he covered the victim's head with a garbage bag due to the blood loss, there is additional evidence which indicates that appellant may have covered the body with a garbage bag in contemplation of disposing of the body. Camp testified that Davis and appellant were discussing disposal of the body:
 {¶ 44} "Q. Do you recall anything being said or you saying anything specifically?
 {¶ 45} * * *
 {¶ 46} "A. They were just, like I said, they were discussing what to do with the body, whether to dump it or to chop it up.
 {¶ 47} "Q. Do you specifically recall what the exact words were?
 {¶ 48} "A. They said something about chop suey. And I remember that stuck in my head because it was, you know, strange to me."
 {¶ 49} Additionally, Davis verified an earlier statement that he made to the police regarding appellant's plan to throw the victim's body in the river:
 {¶ 50} "Q. Doug ever express to you why he put that garbage bag over the body?
 {¶ 51} "A. No.
 {¶ 52} "Q. Do you think he was going to throw it in the river?
 {¶ 53} "A. I don't know. I can't say what somebody else is going to do, really.
 {¶ 54} "Q. During your interview, question/answer:
 {¶ 55} `Question: "Why'd Doug put the body in the garbage bag and ask for another one?
 {¶ 56} `Answer: I believe he was going to throw it in the river.
 {¶ 57} `Question: Is that what he told you?
 {¶ 58} `Answer: Yeah, he told me he was going to kill everybody and throw them in the river.'
 {¶ 59} "Do you remember saying that?
 {¶ 60} "A. Vaguely."
 {¶ 61} Upon our review of the record, we find that sufficient evidence was presented which tended to satisfy the elements of R.C. 2927.01(B), and that reasonable minds could have reached different conclusions as to whether placing a garbage bag over the head and torso of a body, in apparent contemplation of disposing of the body, and throwing alcohol on and around a body, could establish beyond a reasonable doubt that appellant treated "a human corpse in a way that would outrage reasonable community sensibilities."
 {¶ 62} Additionally, insofar as we have independently considered the sufficiency of the evidence presented at trial with respect to R.C. 2927.01(B), we find it is irrelevant that the trial court denied the motion for judgment of acquittal by finding that any human being would consider the fact that the victim was placed in a garbage bag and referred to as chop suey to be "an outrage against family sensibility," as opposed to an "outrage of reasonable community sensibilities." Appellant's motion was properly denied, regardless.
 {¶ 63} Accordingly, based on the foregoing, we find that the trial court did not error in denying appellant's motion for judgment of acquittal on the charge of gross abuse of a corpse. Appellant's second assignment of error is therefore found not well-taken.
 {¶ 64} Appellant argues in his third assignment of error that the jury's verdict of guilty on Count 3, gross abuse of a corpse, was against the manifest weight of the evidence and the evidence on that count was insufficient to support the conviction. We disagree.
 {¶ 65} Sufficiency of the evidence and manifest weight of the evidence are quantitatively and qualitatively different legal concepts. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. "Sufficiency" applies to a question of law as to whether the evidence is legally adequate to support a jury verdict as to all elements of a crime. Id. In making this determination, an appellate court must determine whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 66} Under a manifest weight standard, an appellate court sits as a "thirteenth juror" and may disagree with the fact finder's resolution of the conflicting testimony. Thompkins at 387. The appellate court, "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id., quoting State v. Martin (1983),20 Ohio App.3d 172, 175.
 {¶ 67} Based on the facts discussed above with respect to the second assignment of error, we find that there was sufficient evidence presented at trial to establish the elements of R.C.2927.01(B). See Jenks, supra. We further find that the verdict was not against the manifest weight of the evidence, and that the jury did not clearly lose its way in convicting appellant of gross abuse of a corpse. See Thompkins, supra. There was sufficient evidence to establish that appellant did put the victim into a garbage bag, at least to some extent, and that he dumped liquor on the body. Moreover, we find the crime of gross abuse of a corpse to be proven beyond a reasonable doubt. Specifically, we find that "reasonable community sensibilities" could clearly be outraged by appellant dumping whiskey and tequila on his victim's body and putting him in a garbage bag, an item typically used to contain trash or discarded materials, while considering ways to dispose of the body. Accordingly, we find appellant's third assignment of error not well-taken.
 {¶ 68} Appellant argues in his fourth assignment of error that the trial court erred in imposing the maximum prison term for the fifth degree felony, abuse of a corpse, without making the findings mandated by statute to (1) overcome the presumption against incarceration and (2) justify a maximum prison term. Appellant additionally raises in his fifth assignment of error that the trial court erred in sentencing appellant to consecutive terms of imprisonment for counts one and three without making the requisite findings.
 {¶ 69} At appellant's sentencing hearing, the trial court made the following findings:
 {¶ 70} "* * * He is also sentenced to twelve months imprisonment as to the abuse of a corpse conviction, which, in light of the defendant's criminal record, so much of it involves weapons.
 {¶ 71} "In 1990, arrested for aggravated menacing with a gun. In 1992, domestic violence, threatening Christine Beckley with a semi-automatic pistol. In 2001, in December, he was arrested for DUI and had a loaded gun and a knife on his person.
 {¶ 72} "The court believes to adequately protect the public, and due to this criminal history, that this twelve months should be served consecutive to both the other sentences."
 {¶ 73} When an allegation is made that the sentence imposed by the trial court is contrary to law, a reviewing court must "`look to the record to determine whether the sentencing court (1) considered the statutory factors, (2) made the required findings, (3) relied on substantial evidence in the record to support those findings, and (4) properly applied the statutory guidelines.'" State v. York, 6th Dist. No. WD-03-017,2003 Ohio 7249, at ¶ 15, citing, State v. Longnecker, 4th Dist. No. 02CA76, 2003 Ohio 6208, at ¶ 36.
 {¶ 74} R.C. 2929.13(B)(1) states that when sentencing for a fifth degree felony, "the sentencing court shall determine" whether any of the conditions listed in R.C. 2929.13(B)(1)(a) — (i) apply. If the sentencing court makes a finding described in R.C. 2929.13(B)(1)(a) — (i), and "if the court, after considering the factors set forth in [R.C. 2929.12], finds that a prison term is consistent with the purposes and principles of sentencing set forth in [R.C. 2929.11] and finds that the offender is not amenable to an available community control sanction, the court shall impose a prison term upon the offender." R.C. 2929.13(B)(2)(a). Further, R.C. 2929.19(B)(2)(a) requires the sentencing court to give its reasons for imposing a prison term for a fifth degree felony, based upon the overriding purposes and principles of felony sentencing set forth in section R.C. 2929.11, and any factors from R.C. 2929.13(B)(1)(a) to (i) that the court finds applicable to the offender.
 {¶ 75} When imposing the maximum sentence for an offense, the sentencing court is required to do two things: (1) make a finding that the offender committed the worst form of the offense or
that the offender poses the greatest likelihood of committing future crimes; and (2) state the reasons that support its findings on the record during the sentencing hearing. See R.C.2929.14(C); R.C. 2929.19(B)(2)(d); and State v. Newman (2003),100 Ohio St.3d 24, citing, State v. Comer (2003),99 Ohio St.3d 463.
 {¶ 76} With respect to ordering that consecutive sentences be served, the sentencing court must find "that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public * * *." (Emphasis added.) R.C. 2929.14(E)(4). They must also find any of the following:
 {¶ 77} "(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 {¶ 78} "(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
 {¶ 79} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender." R.C.2929.14(E)(4)(a) — (c).
 {¶ 80} With respect to the trial court's imposition of a prison term for appellant's fifth degree felony, we find that the trial court failed to make any finding as described in R.C.2929.13(B)(1)(a) — (i) and R.C. 2929.13(B)(2)(a). We further find, with respect to the court's imposition of a maximum sentence, that the trial court failed to find on the record that appellant committed the worst form of the offense or that he poses the greatest likelihood of committing future crimes. See R.C. 2929.14(C); R.C. 2929.19(B)(2)(d); and State v. Newman
(2003), 100 Ohio St.3d 24, citing, State v. Comer (2003),99 Ohio St.3d 463. Accordingly, we find appellant's fourth assignment of error well-taken.
 {¶ 81} With respect to the trial court's imposition of consecutive sentences, we find that the trial court failed to make all of the necessary findings mandated by R.C.2929.14(E)(4). Although the court stated that it imposed consecutive sentences because it believed such was necessary "to adequately protect the public, and due to his criminal history, that this twelve months should be served consecutive to both the other sentences," the court failed to find that "that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public * * *." See R.C. 2929.14(E)(4). Accordingly, we find that appellant's fifth assignment of error is also found well-taken.
 {¶ 82} R.C. 2953.08(G)(1) states that if the sentencing court was required to make the findings required by R.C. 2929.13(B) or R.C. 2929.14(E)(4), relative to the imposition of the sentence, and if the sentencing court failed to state the required findings on the record, the court hearing an appeal * * * shall remand the case to the sentencing court and instruct the sentencing court to state, on the record, the required findings." Having found that the trial court failed to make the necessary findings pursuant to R.C. 2929.13(B)(1), R.C. 2929.14(C), R.C. 2929.14(E)(4), and R.C.2929.19(B)(2)(d), we remand the matter to the trial court to make the required findings with respect to the gross abuse of a corpse sentence.
 {¶ 83} We additionally note that, although Comer does not address the question of whether the finding and reasons supporting that finding must also be made in the journal entry, we agree with the Seventh District Court of Appeals that it is prudent for the trial court also to state these findings in the journal entry. See State v. Perry, 7th Dist. No. 02 CA 182,2003 Ohio 7000. After all, "[a] court of record speaks only through its journal and not by oral pronouncement or mere written minute or memorandum." State ex rel. Marshall v. Glavas,98 Ohio St.3d 297, 2003 Ohio 857, at ¶ 5, quoting Schenley v.Kauth (1953), 160 Ohio St. 109.
 {¶ 84} On consideration whereof, this court finds that appellant was not prejudiced or prevented from having a fair trial. With respect to appellant's convictions, we therefore affirm the judgment of the Sandusky County Court of Common Pleas. However, insofar as the trial court failed to make the necessary statutory findings with respect to appellant's sentence for the gross abuse of a corpse conviction, we reverse the judgment of the trial court and remand the matter for re-sentencing on that conviction. Court costs of this appeal are to be paid by appellant.
Judgment affirmed, in part and reversed, in part.
Knepper, J., Pietrykowski, J., Singer, J. concur.
[1] R.C. 2927.01(C) states that whoever violates R.C.2927.01(B) is guilty of gross abuse of a corpse, a felony of the fifth degree.